UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| CHARLES K. [1], | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:20-cv-00652-DLP-JMS |
| | ) |
| KILOLO KIJAKAZI, | ) |
| | ) |
| Defendant. | ) |

**ORDER**

Plaintiff Charles K. requests judicial review of the denial by the Commissioner of the Social Security Administration ("Commissioner") of his application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 423(d). For the reasons set forth below, the Court hereby **AFFIRMS** the ALJ's decision denying the Plaintiff benefits.

**I.   PROCEDURAL HISTORY**

On November 5, 2018, Charles filed his application for Title II DIB benefits. (Dkt. 14-2 at 19, R. 18). Charles alleged disability based on right ankle degenerative joint disease, right shoulder degenerative joint disease, emphysema, arthritis, high blood pressure, high cholesterol, metal rod in his right femur, and pin in his right

---

[1] In an effort to protect the privacy interests of claimants for Social Security benefits, the Southern District of Indiana has adopted the recommendations put forth by the Court Administration and Case Management Committee of the Administrative Office of the United States Courts regarding the practice of using only the first name and last initial of any non-government parties in Social Security opinions. The Undersigned has elected to implement that practice in this Order.

1

hip. (Dkt. 14-3 at 3, R. 63). The Social Security Administration ("SSA") denied Charles's claim initially on February 26, 2019, (Dkt. 14-3 at 2-12, R. 62-72), and on reconsideration on May 31, 2019, (Dkt. 14-3 at 13-24, R. 73-84). On June 24, 2019, Charles filed a written request for a hearing, which was granted. (Dkt. 14-4 at 15-16, R. 117-18).

On June 8, 2020, Administrative Law Judge ("ALJ") Colleen M. Mamelka conducted a hearing, where Charles and vocational expert Toni M. McFarland appeared telephonically. (Dkt. 14-2 at 36-62, R. 35-61). On June 29, 2020, ALJ Mamelka issued an unfavorable decision finding that Charles was not disabled. (Dkt. 14-2 at 19-30, R. 18-29). Charles appealed the ALJ's decision and, on October 6, 2020, the Appeals Council denied Charles's request for review, making the ALJ's decision final. (Dkt. 14-2 at 2, R. 1). Charles now seeks judicial review of the ALJ's decision denying benefits pursuant to 42 U.S.C. § 1383(c)(3).

## II.   STANDARD OF REVIEW

Under the Act, a claimant may be entitled to DIB only after he establishes that he is disabled. To prove disability, a claimant must show he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To meet this definition, a claimant's impairments must be of such severity that he is not able to perform the work he previously engaged in and, based on his age, education, and work experience, he cannot engage

2

in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A).

The SSA has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520(a). The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted). An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at 352. If a claimant satisfies steps one and two, but not three, then he must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995); *see also* 20 C.F.R. § 404.1520 (a negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled).

After step three, but before step four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The RFC is an assessment of what a

claimant can do despite his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004). In making this assessment, the ALJ must consider all the relevant evidence in the record. *Id.* at 1001. The ALJ uses the RFC at step four to determine whether the claimant can perform his own past relevant work and if not, at step five to determine whether the claimant can perform other work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4)(iv)-(v).

The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id.* The Commissioner must then establish that the claimant – in light of his age, education, job experience, and residual functional capacity to work – is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

Judicial review of the Commissioner's denial of benefits is to determine whether it was supported by substantial evidence or is the result of an error of law. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). This review is limited to determining whether the ALJ's decision adequately discusses the issues and is based on substantial evidence. Substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is

not whether Charles is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

Under this administrative law substantial evidence standard, the Court reviews the ALJ's decision to determine if there is a logical and accurate bridge between the evidence and the conclusion. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). In this substantial evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, she must build an "accurate and logical bridge from the evidence to h[er] conclusion," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for the decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in her decision, but she cannot ignore a line of evidence that undermines the conclusions she made, and she must trace the path of her reasoning and connect the evidence to her findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford*, 227 F.3d at 872.

5

### III. BACKGROUND

#### A. Factual Background

Charles was forty-five years old as of his July 6, 2017 alleged onset date. (Dkt. 14-3 at 2, R. 62). He completed the eleventh grade, attended special education classes while in high school, and has specialized training in auto service and technology. (Dkt. 14-6 at 7, R. 191). Charles has relevant past work history as an auto technician, warehouse picker, and quality controller in the manufacturing industry. (Id. at 8, R. 192).

#### B. ALJ Decision

In determining whether Charles qualified for benefits under the Act, the ALJ employed the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a) and concluded that Charles was not disabled. (Dkt. 14-2 at 19-30, R. 18-29). At Step One, the ALJ found that Charles had not engaged in substantial gainful activity from his alleged onset date of July 6, 2017 through his date last insured of September 30, 2018. (Id. at 21, R. 20).

At Step Two, the ALJ found that Charles's degenerative joint disease of the right ankle and right shoulder were severe medically determinable impairments. (Dkt. 14-2 at 21, R. 20). The ALJ also found that Charles's medically determinable impairments of hypertension, hyperlipidemia, and emphysema were non-severe through Charles's date last insured. (Id.). The ALJ concluded that Charles's low average range of intellectual ability was also a non-severe medically determinable impairment. (Id. at 22, R. 21). In making this finding, the ALJ considered the

6

"paragraph B" criteria, and concluded that Charles had no limitation in interacting with others, but mild limitations in understanding, remembering, or applying information; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Dkt. 14-2 at 22, R. 21).

At Step Three, the ALJ found that through the date last insured, Charles's impairments or combination of impairments did not meet or medically equal the severity of one of the impairments in the Listings. (Dkt. 14-2 at 22, R. 21). In reaching this determination, the ALJ considered Listings 1.02 and 1.03. (Id.).

After Step Three but before Step Four, the ALJ found that, through the date last insured, Charles had the residual functional capacity ("RFC") to perform sedentary work, with the following exertional limitations: can sit for 30 minutes at a time with standing/walking up to 2 hours in an 8-hour workday, but in increments not to exceed 15 minutes; can occasionally climb ramps and stairs, balance, stoop, kneel, and crawl; cannot overhead reach with the right upper extremity or climb ladders, ropes, or scaffolds; cannot crouch or be exposed to unprotected heights, dangerous moving machinery, or extreme humidity or wetness; must work on even terrain and non-slip surfaces; must never operate foot controls with the right lower extremity; and is required to use an assistive device for balance and ambulation. (Dkt. 14-2 at 23-28, R. 22-27).

At Step Four, the ALJ concluded that, through the date last insured, Charles was unable to perform any past relevant work. (Dkt. 14-2 at 28-29, R. 27-28).

At Step Five, relying on the vocational expert's testimony, the ALJ determined that, through the date last insured, considering Charles's age, education, work experience, and residual functional capacity, jobs existed in significant numbers in the national economy that Charles could have performed. (Dkt. 14-2 at 29-30, R. 28-29). The ALJ thus concluded that Charles was not disabled. (Id. at 30, R. 29).

### IV.   ANALYSIS

In support of his request for reversal, Charles challenges the ALJ's decision on two bases: (1) the ALJ erroneously concluded that Charles's conditions did not meet Listing 1.02 and 1.03[2], and (2) the ALJ erred in the weight given to Plaintiff's treating podiatrist, Dr. Miranda Goodale. The Court will consider these arguments in turn.

### A.  *Step Three*

Charles argues that he should have been found disabled at Step Three because he meets Listing 1.02 (for major dysfunction of a joint) and Listing 1.03 (for reconstructive surgery or surgical arthrodesis of a major weight bearing joint). (Dkt. 18 at 13-17).[3] In response, the Commissioner maintains that the ALJ's findings were supported by substantial evidence. (Dkt. 21 at 10-11).

---

[2] Plaintiff also argues that his telephonic disability hearing was "compromised and unfair" because the ALJ could not see how physically limited he was. (Dkt. 18 at 12). However, this argument is waived. *Mitchell v. Berryhill*, No. 17 C 6241, 2019 WL 426149, at *8 (N.D. Ill. Feb. 4, 2019) ("A claimant generally forfeits any objections that are . . . raised for the first time after an administrative hearing."). Moreover, Plaintiff requested a telephonic hearing. (Dkt. 14-4 at 61, R. 163).
[3] Effective April 2, 2021, the Social Security Administration revised the listings for evaluating musculoskeletal disorders. Listing 1.02 is now Listing 1.18, while Listing 1.03 is now Listing 1.17.

Under Step Three of the sequential evaluation process, if a claimant has an impairment that meets or medically equals the criteria of an impairment found in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumptively disabled and qualifies for benefits. *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). The Listings specify the criteria for impairments that are considered presumptively disabling. *Minnick*, 775 F.3d at 935 (citing 20 C.F.R. § 404.1525(a)). A claimant may also demonstrate presumptive disability by showing that his impairments are accompanied by symptoms that are equal in severity to those described in a specific listing. *Id.* (citing 20 C.F.R. § 404.1526).

It is the claimant's burden to prove that his condition meets or equals a listed impairment. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). To meet or equal a listed impairment, the claimant must satisfy all of the criteria of the listed impairment with medical findings. *Minnick*, 775 F.3d at 935; *Sims*, 309 F.3d at 428; *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).

Listing 1.02, for major dysfunction of a joint due to any cause, is characterized by:

> gross anatomical deformity (*i.e.*, subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

---

*Revised Medical Criteria for Evaluating Musculoskeletal Disorders*, FED. REG. (Dec. 3, 2020), https://www.govinfo.gov/content/pkg/FR-2020-12-03/pdf/2020-25250.pdf.

> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
>
> or
>
> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.02. To ambulate effectively means that an individual is capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.00B2b. Conversely, ineffective ambulation is defined as having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits functioning of both upper extremities. *Id.* Examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, and the inability to walk on rough or uneven surfaces. *Id.*

To meet Listing 1.03, a claimant must demonstrate reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.03.

In his brief, Charles appears to argue that he meets Listing 1.02A and 1.03. (Dkt. 18 at 13-14). To support this contention, Charles highlights the record evidence that he maintains demonstrates that following reconstructive surgery of

10

his right ankle joint, he did not return to effective ambulation. (Dkt. 18 at 14, 17). Charles also argues that the ALJ cherry-picked the evidence and misconstrued Dr. Fitzsimmons' October 18, 2018 treatment note. (Id. at 15-16). In response, the Commissioner asserts that the ALJ properly found Plaintiff's conditions did not meet Listing 1.02 or Listing 1.03 because Plaintiff has not shown ineffective ambulation nor has Plaintiff identified equivalent findings the ALJ failed to consider. (Dkt. 20 at 14).

Here, the ALJ found that Charles did not meet or medically equal Listings 1.02 or 1.03 because the record did not provide any evidence demonstrating Charles' inability to ambulate effectively through September 30, 2018. (Dkt. 14-2 at 23, R. 22). Relying on Dr. Fitzsimmons' examination notes from June and July 2018, the ALJ acknowledged that Charles had no swelling or tenderness in his right ankle, limited range of motion, limited inversion (ability to turn inward) and eversion (ability to turn outward) of the right ankle, and that his sensation was intact. (Dkt. 14-2 at 23, 25, R. 22, 24; Dkt. 14-7 at 97, R. 352). The ALJ noted that Dr. Fitzsimmons ordered imaging of Charles ankle, which showed post-surgical changes and some soft tissue swelling.[4] (Dkt. 14-2 at 23, R. 22).

On June 28, 2018, during Charles' initial evaluation for physical therapy, the examiner, Ms. Stewart, noted Charles ambulating with axillary crutches and a stiff right lower extremity, but that he could weight bear as tolerated on the right lower

---

[4] A June 14, 2018 X ray of Charles' ankle indicated moderate increase in bone density of the talus posteriorly possibly due to ischemic necrosis. (Dkt. 14-7 at 87, R. 342). A June 25, 2018 MRI suggested loss of height in the talar dome with possible fragmentation of the talar dome. (Dkt. 14-7 at 110, R. 365).

11

extremity. (Dkt. 14-7 at 106, R. 861). The examiner found Charles' anterior tibialis[5] and gastrocnemius/soleus[6] short and tight, and generalized tenderness in Charles' ankle and foot. (Id.). Charles had poor single leg balance requiring upper extremity support. (Id.). Ms. Stewart was unable to perform the single leg stance due to Charles' reported pain. (Id.). Ms. Stewart found Charles' pain behavior inconsistent with injury. (Id.). She also noted that Charles could perform all activities of daily living, although difficult. (Dkt. 14-7 at 106, R. 861). As the ALJ acknowledged, Charles declined to schedule any physical therapy sessions, and instead opted for home therapy exercises until he met with Dr. Fitzsimmons again. (Dkt. 14-2 at 26, R. 25; Dkt. 14-7 at 107, R. 862).

Charles met with Dr. Fitzsimmons on July 10, 2018 as a follow-up for his foot pain. (Dkt. 14-7 at 93, R. 348). During this visit, Dr. Fitzsimmons noted the MRI of Charles' feet was within normal limits, except post-surgical changes. (Id.). Charles reported no relief with Mobic and indicated that physical therapy had not helped. (Id.). At the time of the July appointment, Charles had only attended an initial physical therapy evaluation, declined to schedule any physical therapy sessions, and agreed to engage in home exercises. (Dkt. 14-7 at 107, R. 862). As the ALJ noted, Dr. Fitzsimmons' July physical examination of Charles' ankle showed no

---

[5] The tibialis anterior muscle is primarily responsible for dorsiflexion and inversion of the foot. Dorsiflexion is critical to gait because this movement clears the foot off the ground during the swing phase. Pallavi Juneja, *Anatomy, Bony Pelvis and Lower Limb, Tibialis Anterior Muscles*, STATPEARLS (Aug. 13, 2021), https://www.ncbi.nlm.nih.gov/books/NBK513304/#:~:text=The %20tibialis%20anterior%20muscle%2C%20also,medial%20border%20of%20the%20foot.
[6] The gastrocnemius/soleus, or calf muscle, pulls the heel up to allow forward movement during walking, running, or jumping. Carol DerSarkissian, *The Calf Muscle*, WEBMD (June 23, 2021), https://www.webmd.com/fitness-exercise/picture-of-the-calf-muscle#:~:text=The%20 gastrocnemius%20is%20the%20larger,lies%20underneath%20the%20gastrocnemius%20muscle.

12

tenderness, ecchymosis (discoloration of the skin due to bleeding), redness, or swelling. (Dkt. 14-2 at 23, R. 22; Dkt. 14-7 at 94, R. 349).

Charles next saw Dr. Fitzsimmons on October 18, 2018, seeking a prescription for crutches as he was trying to get disability.[7] (Dkt. 14-7 at 91-92, R. 346-37). Charles again reported no relief with Mobic and physical therapy. (Dkt. 14-7 at 92, R. 347). The Plaintiff has not highlighted any physical therapy records between July and October 2018. Dr. Fitzsimmons noted that Charles reported trying to use a cane, and while it helped prevent him from falling, he still had pain with the cane. (Dkt. 14-7 at 92, R. 347). Charles also reported having no pain when he is able to keep off his foot. (Id.). Dr. Fitzsimmons noted that Charles was using his own crutches. (Id.). On physical examination, Dr. Fitzsimmons found no swelling or deformity of Charles' right ankle, but noted that Charles was unable to flex or extend his ankle, had severe pain with passive flexion or extension, and had tenderness over the anterior ankle in no focal region. (Id.). Dr. Fitzsimmons prescribed Charles crutches but advised Charles to not use them continuously. (Id. at 91, R. 346). Dr. Fitzsimmons also advised Charles to see an orthopedist in either Indianapolis or Brazil. (Id). Charles declined this recommendation. (Id.).

State Agency consultants, Dr. M. Ruiz and Dr. J. Sands, both considered Listing 1.02 and also found that Charles did not meet or equal the Listing. (Dkt. 14-3 at 6, 10, 18, 22, R. 66, 70, 78, 82). The consultants found that Charles could occasionally use the right lower extremity for pushing and pulling; needed to use a

---

[7] The ALJ considered portions of this record in assessing the Listings. (Dkt. 14-2 at 23, R. 22).

13

cane for prolonged standing and walking but could use the opposite hand to lift and carry; could frequently stoop, kneel, crouch, and crawl; could never climb ladders, ropes, or scaffolds but could occasionally climb ramps, stairs, and balance; and must avoid concentrated exposure to wetness and hazards. (Dkt. 14-2 at 27-28, R. 26-27; Dkt. 14-3 at 2-11, 13-23, R. 62-71, 73-83). The ALJ, however, found greater restrictions were appropriate based on new evidence in the record, which Charles does not contest. (Dkt. 14-2 at 28, R. 27).

The ALJ's sufficiently supported her conclusion at Step Three and in her discussions throughout the opinion, including the RFC discussion. During the relevant period, July 6, 2017 to September 30, 2018, medical records demonstrated instances of no ankle swelling or tenderness, intact sensation, weight bearing, and imaging within normal limits. (Dkt. 14-2 at 23, 26 R. 22, 25; Dkt 14-7 at 124-26, R. 379-81). The Plaintiff has failed to identify objective medical evidence during the relevant period that demonstrates that he had an inability to effectively ambulate.

As the ALJ acknowledged, Charles requested a prescription for crutches from Dr. Fitzsimmons at his October 2018 appointment; however, Dr. Fitzsimmons advised the Plaintiff to not use the crutches continuously and to seek an orthopedist. (Dkt. 14-2 at 23, R. 22; Dkt. 14-7 at 91, R. 346). The ALJ reasoned that Dr. Fitzsimmons' treatment note did not support Charles' contention of an inability to ambulate effectively through September 30, 2018. (Dkt. 14-2 at 23, R. 22). Taken the record as whole, the ALJ acknowledged that Charles' treating doctors managed him conservatively with medication, Charles did not follow through with the

14

recommended physical therapy or orthopedist referral, and that Charles was not prescribed an assistive device until after the date last insured. (Dkt. 14-2 at 26-27, R. 25-26).

The ALJ also reasoned that Charles did not meet Listing 1.02B because only one upper extremity – Charles' right shoulder – was involved, and Charles retained the ability to perform fine and gross movements effectively, as evident through his activities of daily living, including bathing independently, dressing himself, personal hygiene, preparing meals, doing household chores, and putting clothes in the washing machine. (Dkt. 14-2 at 23, R. 22).

The above analysis is not perfunctory and explains why the ALJ determined that Charles had not demonstrated an inability to effectively ambulate, thus not meeting or medically equaling the Listings. Because substantial evidence supports the ALJ's decision, remand is not warranted on this issue.

### B. *Weight Given to Treating Physician*

Charles also contends that the ALJ erred in assessing the opinion of his podiatrist, Dr. Miranda Goodale. (Dkt. 18 at 17-20). In response, the Commissioner asserts that the ALJ properly evaluated Dr. Goodale's opinion. (Dkt. 20 at 18-24).

Under the prior regulations, "more weight [was] generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870 (citations omitted); *see* 20 C.F.R. § 416.927(c)(2). This so called "treating physician rule," however, was eliminated for claims, such as Charles's, filed after March 27, 2017. *McFadden v.*

15

*Berryhill*, 721 F. App'x 501, 505 n.1 (7th Cir. 2018). "Nonetheless, the ALJ must still provide a written explanation for [her] conclusion about the treating physician's opinion, drawing a logical bridge from the evidence to the conclusion." *Varga v. Kijakazi*, No. 3:20-cv-575-JPK, 2021 WL 5769016, at \*3 (N.D. Ind. Dec. 6, 2021).

"Opinion evidence is now governed by 20 C.F.R. § 404.1520c. . . (2017)." *McFadden*, 721 F. App'x at 505 n.1. The ALJ no longer assigns "any specific evidentiary weight" to medical opinions, but rather evaluates the persuasiveness of medical opinions. 20 C.F.R. § 404.1520c. When considering the persuasiveness of any medical opinion, an ALJ must now consider the following factors: supportability; consistency; relationship with the claimant, including the length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship, and examining relations; specialization; and any other factors that tend to support the medical opinion, including evidence that the medical source is familiar with other medical evidence or has an understanding of social security policies. *See Inman v. Saul*, No. 1:20-cv-231 DRL, 2021 WL 4079293, at \*2 (N.D. Ind. Sept. 7, 2021). The most important factors are the opinion's supportability and consistency. 20 C.F.R. § 404.1520c(a). These are the factors the ALJ must explicitly discuss, whereas the ALJ need only consider the other factors. 20 C.F.R. § 404.1520c(b). Failure to adequately discuss supportability and consistency requires remand. *Tammy M. v. Saul*, No. 2:20-cv-285, 2021 WL 2451907, at \*7-8 (N.D. Ind. June 16, 2021).

Charles maintains that the ALJ's evaluation of Dr. Goodale's opinion is unsupported by substantial evidence and fails to apply the factors required by 20 C.F.R. § 1520(c). Specifically, Charles asserts that the ALJ failed to address Dr. Goodale's expertise and the treating relationship, but instead relied on the flawed opinions of the state agency medical consultants. (Dkt. 18 at 18). Lastly, without any citation to the record, Charles argues that Dr. Goodale's opinion is consistent with Dr. Burkle's 2014 examination and Dr. Fitzsimmons's treatment records. (Id. at 19). In response, the Commissioner contends that the ALJ properly considered the timing of Dr. Goodale's opinion, Dr. Goodale's status as a podiatrist is not controlling, and Dr. Goodale's opinion is not consistent with Dr. Burkle's 2014 examination. (Dkt. 20 at 19-23).

Plaintiff's treating podiatrist, Dr. Miranda Goodale, filled out a physical medical assessment form regarding Charles' right ankle on July 11, 2019. (Dkt. 14-7 at 151-54, R. 406-09). Dr. Goodale indicated she had seen Charles every six months since November 2018. (Id. at 151, R. 406). Charles experienced limited motion, pain, and swelling. (Id.). Dr. Goodale opined that Charles would be off task 25% or more of a typical workday, would likely be absent from work 30 days per month, and would need an assistive device. (Dkt. 14-7 at 151-52, R. 406-07). Dr. Goodale noted that after an hour of activity it would take Charles approximately four hours to recover. (Dkt. 14-7 at 151, R. 406). Dr. Goodale supported her opinion finding Charles had no ankle or subtalar joint motion in the right ankle, pain on palpitation of the right sinus tarsi, and pain with great toe extension. (Id. at 151-52, R. 406-07).

Dr. Goodale also found various postural and exertional limitations, including sitting 30 minutes at one time; standing 1 hour at a time; sitting less than two hours and standing/walking less than 2 hours in an 8-hour work day; occasionally lifting and carrying less than 10 pounds but never carrying 10 pounds or more; only occasional use of right foot controls; and occasional balancing but no climbing, stooping kneeling, crouching, or crawling. (Dkt. 14-2 at 27, R. 26; Dkt. 14-7 at 151-53, R. 406-08).

The ALJ found Dr. Goodale's assessment was not well supported by the doctor's own treatment notes, by the objective medical evidence, by the conservative treatment, or by the physical examination findings during the relevant period. (Dkt. 14-2 at 27, R. 26). The ALJ first recognized that Dr. Goodale did not begin treating Charles until after the relevant period. (Id.). Further, Dr. Goodale failed to support her limitations with any evidence contemporaneous with the period of eligibility. The ALJ goes on to recognize that Dr. Goodale failed to corroborate her contention that Charles would need to miss 30 days of work or that he would be off task 25% or more with any medical evidence. (Dkt. 14-2 at 27, R. 26). The ALJ also noted that Dr. Goodale's exertional and postural restrictions were not supported by her own treatment notes. (Id.).

As discussed above, the ALJ exhaustively summarized Charles's medical records throughout the opinion. Dr. Goodale's treatment records from July 11, 2019 provided that Charles' ankle brace prevented his foot from bending too far back and hurting as much as without it. (Dkt. 14-7 at 168, R. 423). Dr. Goodale noted that

Charles was able to walk 1.5 hours with crutches, though he did experience worsening foot pain. (Dkt. 14-7 at 168, R. 423). Moreover, after being administered trigger point injection in July 2019, Charles reported being 85% pain free. (Dkt. 14-7 at 158-59, R. 413-14).

First, the Plaintiff does not refute the ALJ's finding that Dr. Goodale failed to support any of her diagnosis or exertional or postural limitations with evidence from the record. Next, contrary to Plaintiff's assertions, the ALJ was not required to address Dr. Goodale's expertise or treating relationship in the opinion. Under the new regulation, the only factors that must be explicitly discussed are supportability and consistency. 20 C.F.R. § 404.1520c(b). Dr. Goodale did not begin treating Charles until November 12, 2018, (Dkt. 14-7 at 115, R. 370), which is after the date last insured. As the Seventh Circuit instructs, evidence from after the date last insured is "relevant only to the degree that [it sheds] light on [the claimant's] impairments and disabilities from the relevant insured period." *Million v. Astrue*, 260 F. App'x 918, 921-22 (7th Cir. 2008). Dr. Goodale did not represent either in her treatment records or in the physical medical assessment form that she completed in July 2019 that her diagnosis was retrospective or based on medical evidence from July 6, 2017 to September 30, 2018, the relevant time period. (Dkt. 14-7 at 151-54, R. 406-09). Lastly, the ALJ did not have a duty to reconnect with Dr. Goodale because the ALJ found her opinion unsupported. *David K. v. Kijakazi*, No. 1:20cv391, 2021 WL 5755367 (N.D. Ind. Dec. 3, 2021) (citing *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)); *see also Dean v. Berryhill*, No. 1:16-cv-03340-

SEB-MJD, 2017 WL 9730256 (S.D. Ind. Nov. 9, 2017) ("While an ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable, the ALJ need not solicit additional information if she simply finds the physician's opinion unsupported.").

Focusing on the required factors of supportability and consistency, the ALJ's opinion provides sufficient support for her conclusion that Dr. Goodale's assessment is not persuasive. Because the ALJ has built a logical bridge between the evidence and her assessment of Dr. Goodale's opinion, the Court finds no grounds for remand on this issue.

### V. CONCLUSION

For the reasons detailed herein, the Court **AFFIRMS** the ALJ's decision denying the Plaintiff benefits. Final judgment will issue accordingly.

So ORDERED.

Date: 3/22/2022

*Doris L. Pryor*
Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email